**REVERSE and REMAND and Opinion Filed August 29, 2022**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00354-CV

### WHITE NILE SOFTWARE, INC., Appellant
### V.
### JEFFREY M. TRAVIS AND TRAVIS & CALHOUN, P.C., Appellees

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-17108**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Goldstein
Opinion by Justice Goldstein

White Nile Software, Inc., appeals the trial court's order granting the motion for traditional summary judgment filed by Jeffrey M. Travis and Travis & Calhoun, P.C., in White Nile's underlying suit alleging claims of legal malpractice. White Nile raises six issues addressing its contention that the *Hughes* tolling rule or the equitable doctrine of adverse domination extended the time for filing its legal malpractice claims against Travis and his firm. We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## BACKGROUND

The record shows White Nile was formed in July 2005 by Steven Thrasher and Edward Mandel to develop Thrasher's idea for a new internet search engine.[1] A dispute arose and, in January 2006, Mandel and others acting as White Nile's board of directors hired attorney Jeffrey Travis and the firm of Travis & Calhoun to represent White Nile in bringing claims against Thrasher. According to the terms of a January 11, 2006 retainer, Travis undertook to represent White Nile and Mandel and other members of the board individually. That same day, Mandel and the others signed a waiver of any conflict of interest that might arise as a result of Travis' joint representation of them individually and White Nile. Following an unsuccessful informal mediation with Thrasher at which Travis was present, Mandel and the others executed a document declaring that White Nile was no longer a going concern and releasing Mandel and the others from their non-competition and non-disclosure agreements with White Nile. However, the release specifically provided that White Nile was not releasing Thrasher from the assignment of his intellectual property to White Nile. Travis reviewed White Nile's affairs and allegedly developed a strategy to induce Thrasher to file litigation, thereby deadlocking White Nile and allowing

---

[1] The initial agreements between Thrasher and Mandel in the formation of White Nile included consulting agreements naming Thrasher as co-founder, inventor and chief executive officer and Mandel co-founder and president and the Unanimous Consent elected Mandel as president and treasurer and Thrasher its chief executive officer and secretary. At the time of the dispute, several others were involved with White Nile, executing documents that purported to remove Thrasher from his offices with White Nile, and leaving Mandel as the sole remaining director. Ownership of White Nile has been at the crux of the ensuing litigation, and Mandel's ownership interest has been hotly contested.

Mandel to transfer White Nile's business and intellectual property into a newly-created entity owned solely by Mandel and his associates.

On January 17, 2006, Mandel's associate Skinner Layne formed a new entity, NeXplore Technologies, and listed Layne as the sole shareholder and director. On January 19, 2006, Travis learned about NeXplore and foresaw the possibility that NeXplore was usurping a White Nile corporate opportunity and that Thrasher might sue. Travis also worked to have money invested in White Nile returned to Layne's parents, the only outside investors in White Nile. Within weeks of its formation, NeXplore received $197,000 from the Laynes and $286,500 from a limited liability company the Laynes had formed. Travis was aware that NeXplore was developing a search engine that could compete with White Nile's. On April 5, 2006, Travis filed suit against Thrasher on behalf of White Nile.[2] From July through October 2006, Travis represented White Nile and also represented Mandel and his associates as representatives of NeXplore.

On January 31, 2007, Thrasher filed his original counterclaim and third-party petition asserting counterclaims against White Nile, Mandel, Williams, and Layne. Among other things, Thrasher alleged causes of action for theft of trade secrets/conversion; breach of contract; breach of fiduciary duty; declaratory

---

[2] Travis had filed suit against Coleman a few months earlier in February 2006 on behalf of White Nile. The Thrasher/Coleman lawsuits pending in the 14th Judicial District, and as reflected in the settlement agreement are referred to as the White Nile Litigation.

judgment as to the ownership of White Nile and intellectual property of White Nile; fraud; fraud in the inducement/negligent misrepresentation; conspiracy; and oppression of shareholder rights.

On February 26, 2007, Travis and his firm withdrew from their representation of White Nile.

In June 2007, Jason Coleman filed his original petition in intervention in the suit between White Nile and Thrasher. Coleman alleged he was the co-owner and co-inventor of Thrasher's search engine and asserted he was a third-party beneficiary of the non-disclosure agreements, confidentiality agreements, and consulting agreements between White Nile and Mandel, Williams, and Layne. Coleman asserted causes of action for injunctive relief, theft of trade secrets/conversion, breach of contract, and conspiracy.

On May 29, 2009, the trial court entered an agreed order appointing local attorney Rosa Orenstein as receiver for White Nile to direct and control White Nile's claims in the state court litigation. Among other things, the order provided that "[n]othing herein shall constitute a waiver of any claim or defense of any party to this litigation, except as specifically set forth herein." The order also provided that the receiver's fees would be paid "by Thrasher (47.5%) and Mandel (52.5%)."[3]

---

[3] Mandel's percentage was his asserted ownership interest in White Nile which was further corroborated in his bankruptcy schedule wherein Mandel claimed a 52.5% ownership interest in White Nile.

On June 20, 2011, the trial court signed an order approving the terms of a settlement between the receiver on behalf of White Nile and Thrasher and Coleman.[4] The order stated that the trial court retained exclusive jurisdiction to interpret or enforce the terms of the settlement agreement.

According to the terms of the settlement agreement itself, the receiver, on behalf of White Nile, assigned to Thrasher and Coleman "White Nile's derivative claims asserted by Thrasher and White Nile, and other claims which Thrasher asserts may exist in favor of White Nile," except for any non-assignable claims. "Non-assignable claims" included, but were not limited to, "White Nile's malpractice claims and sanctions claims arising in or from the White Nile Litigation." Thus, "White Nile" retained its legal malpractice claims. Thrasher and Coleman (1) agreed to cooperate and assist the receiver in investigating and prosecuting malpractice claims, (2) retained the right to advise and consent to the selection of receiver counsel for such claims, and (3) if the receiver was not able to reasonably fund the prosecution of the malpractice claims, Thrasher and Coleman had a right to first be offered the opportunity to investigate and prosecute the malpractice claims.

On August 3, 2011, the trial court signed an order on the receiver's motion to clarify seeking the trial court's permission to clarify whether she could investigate and initiate third party actions against former White Nile professionals. The trial

---

[4] The Settlement, Compromise and Release Agreement ('settlement agreement") reflects the same disputed ownership interest in White Nile of 52.5% claimed by Mandel.

court in all things denied this clarification, including the engagement of specialized legal malpractice counsel to investigate and, if appropriate, initiate third party actions against former White Nile professionals or the investigation and/or initiation of any third-party actions against any former White Nile counsel.

Meanwhile, Mandel filed a chapter 11 bankruptcy petition in January 2010. On September 30, 2011, the bankruptcy court filed findings of fact and conclusions of law noting that the "trial of Mandel's objections to the claims of Thrasher, Coleman, and White Nile was the lengthiest trial of any sort conducted by this Court to date." Among other things, the bankruptcy court ultimately concluded that Mandel was not a co-inventor of any of Thrasher's intellectual property; Mandel did not execute any assignment of intellectual property or trade secrets in favor of White Nile as consideration for his interest in the company; and, therefore, "Mandel's shares in White Nile fail for lack of consideration" and White Nile stock was not property of Mandel's bankruptcy estate. All appeals in Mandel's bankruptcy proceeding were not exhausted until the United States Supreme Court denied certiorari on October 1, 2018.

On November 12, 2018, White Nile filed its original petition against Travis and his firm asserting claims of professional negligence, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and conspiracy for actions taken in the prosecution and defense of White Nile during the White Nile litigation. White Nile further alleged that the underlying litigation still had not been fully resolved, but in

any event the underlying litigation involving Mandel was not finally resolved until October 1, 2018.  Thus, White Nile argued, the statute of limitations on its legal malpractice claims was tolled.

On January 29, 2020, Travis and his firm filed their third traditional motion for summary judgment.  The motion alleged the *Hughes* tolling doctrine did not apply to toll White Nile's claims for legal malpractice, and those claims were barred by limitations.  Specifically, the motion alleged the settlement approved by the trial court in 2011 finally concluded all claims by or against White Nile created in whole or in part by Travis or his firm.  The motion further alleged the equitable tolling doctrine was inapplicable in this case because the receiver "had control of" White Nile beginning on May 29, 2009; the receiver "was aware of the statute of limitations and even pursued a tolling agreement and permission to bring claims against the Travis Defendants, both of which were denied back in 2011"; and the receiver "took no further action to preserve limitations."

On March 2, 2020, the trial court signed an order granting traditional summary judgment in favor of Travis and his firm.  This appeal followed.

In six interrelated issues, White Nile argues the trial court erred in granting traditional summary judgment in favor of Travis and his firm because the *Hughes* tolling rule or the equitable doctrine of adverse domination tolled the statute of limitations on White Nile's claims against Travis and his firm until October 1, 2018.  In making this argument, White Nile asserts that the removal of claims from state

–7–

court to federal court and bankruptcy court did not constitute the "terminal point" of the underlying litigation for purposes of *Hughes* tolling, and the *Hughes* tolling rule applied to its legal malpractice claims characterized as breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and conspiracy claims. We address these issues together.

## ANALYSIS

### A. Standard of Review

The standard for reviewing a traditional summary judgment is well established. *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

If a summary judgment motion is based on limitations, the defendant must conclusively establish every element of that defense, including when the claim

–8–

accrued.  *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 833–34 (Tex. 2018) (per curiam); *Zive v. Sandberg*, 610 S.W.3d 44, 48 (Tex. App. 2020), *aff'd*, 644 S.W.3d 169 (Tex. 2022).  The defendant must also conclusively negate application of the discovery rule and any pled tolling doctrines.  *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019); *Zive*, 610 S.W.3d at 48.

Legal malpractice claims have a two-year limitations period.  *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988).  The discovery rule applies to legal malpractice claims, so such a claim accrues when the claimant discovers or reasonably should have discovered the facts establishing the claim's elements.  *Id.* at 643.

## B. *Hughes* Tolling Doctrine

In 1991, the supreme court adopted a tolling rule for some legal malpractice claims: "[W]hen an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted." *Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 157 (Tex. 1991).

The *Hughes* court identified two policy reasons for its tolling rule: First, denying tolling in the *Hughes* situation could "force the client into adopting inherently inconsistent litigation postures in the underlying case and in the [legal] malpractice case." *Id.* at 156.  Consistent with this policy, the supreme court has further observed that "attorney–client trust would be eroded if the client had to

–9–

scrutinize every stage of the case for possible misstep[s]." *Erikson*, 590 S.W.3d at 565 (footnote omitted). Second, the legal malpractice claim's viability depends on the underlying case's outcome. *Hughes*, 821 S.W.2d at 157.

In *Apex Towing*, the supreme court later held that *Hughes* tolling does not end simply because the client hires new counsel or settles the case. *Apex Towing Co. v Tolin*, 41 S.W.3d 118, 121–22 (Tex. 2001). *Apex Towing* also clarified that the tolling period lasts "until all appeals on the underlying claim are exhausted or the litigation is otherwise finally concluded." *Id.* at 119. It further held that the *Hughes* rule applies to all cases factually matching the *Hughes* paradigm, regardless of whether the underlying policy reasons are implicated in the particular case. *Id.* at 122. The court reasoned that, "in the area of limitations, bright-lines rules generally represent the better approach, and that the policy reasons underlying the Hughes rule appropriately balance the competing concerns of the need to bar stale claims and avoid prejudice to defendants yet preserve a reasonable opportunity for plaintiffs to pursue legitimate claims." *Id.*

### C. Underlying litigation

Here, the 2011 settlement agreement provides that the receiver agrees to investigate and prosecute the non-assignable claims, including but not limited to malpractice claims.[5] The receiver sought to pursue the legal malpractice claims

---

[5] We note that the 2011 settlement agreement ordered Mandell to pay his 52.5% share of the receiver's costs in accordance with his asserted interest in White Nile, raising an issue of whether Mandell's interest

immediately but was prevented by the trial court. "A receiver is an 'officer of the court, the medium through which the court acts.'" *Goin v. Crump*, No. 05-18-00307-CV, 2020 WL 90919, at *10 (Tex. App.—Dallas Jan. 8, 2020) (citing *Congleton v. Shoemaker*, No. 09-11-00453-CV, 2012 WL 1249406, at *2 (Tex. App.—Beaumont Apr. 12, 2012, pet. denied) (mem. op.) (quoting *Sec. Trust Co. v. Lipscomb Cty.*, 180 S.W.2d 151, 158 (Tex. 1944)). A receiver derives her authority from the appointing court and has only the powers conferred upon her by such court. *Id.* "[S]he is a disinterested party, the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property in receivership." *Magaraci v. Espinosa*, No. 03-14-00515-CV, 2016 WL 858989, at *2 (Tex. App.—Austin Mar. 4, 2016, no pet.) (mem. op.) (quoting *Sec. Trust Co.*, 180 S.W.2d at 158).

Thus, the state court settlement carved out the legal malpractice claims for "White Nile" and gave the receiver the responsibility for prosecuting those claims, with some rights reserved in favor of Thrasher if the receiver did not. The trial court denied the receiver any leave to prosecute or investigate the malpractice claims, and the receiver lacked any authority to act without leave of court. *See Goin*, 2020 WL 90919, at *10.

in White Nile was among the "unassignable" claims retained by the receiver under the terms of the 2011 settlement agreement.

–11–

Thus, rather than coming to a conclusion in 2011, White Nile's legal malpractice claims in state court were in a legal limbo while Mandell's bankruptcy proceedings continued, pending a final determination of authority or capacity to take action on behalf of White Nile.[6] Where "a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him in determining whether limitations have barred his right." *Hughes*, 821 S.W.2d at 157.

We conclude that limitations was tolled until Thrasher and Coleman or some other party was in a position to assume control of the White Nile corporate entity and have the authority to assert White Nile's legal malpractice claims. This issue was only resolved when the order of the bankruptcy court that Mandel had no shares in White Nile became final in October 2018. At that point, whatever had become of the receiver, Thrasher and Coleman were in a position to assist in the prosecution of the malpractice claims and had a right to be first in line to prosecute the malpractice claims if the receiver was unable to prosecute them which, by court order, she was.

Moreover, the settlement agreement does not mention Mandel, Mandel's derivative claims he might have on behalf of White Nile, or whether any claims Mandel had fell under the definition of "non-assignable claims."

---

[6] The bankruptcy court found that upon presentation of Mandel's portion of the receiver's fee, Mandel refused to pay and filed for bankruptcy on the eve of the sanctions hearing. The bankruptcy proceedings addressed unliquidated claims by Thrasher, individually and on behalf of White Nile, as well as claims by the state court appointed receiver of White Nile.

Thus, the contours of Mandell's ownership interest in White Nile were in doubt following the 2011 settlement agreement and remained unclear and in dispute until October 2018. It does appear clear that, because of the settlement, "White Nile" is the sole party that has claims for legal malpractice. But the question becomes, "Who is White Nile?" If the answer is the receiver, then under *Hughes* legal proceedings prevented the claims from being brought, and limitations were tolled. *See Hughes*, 821 S.W.2d at 157. If the answer is that Mandell's ownership interest in White Nile was not finally established until 2018, limitations were also tolled. *See Apex Towing*, 41 S.W.3d at 119.

In reaching this conclusion, we reject Travis' contention that *Hughes* tolling does not apply to White Nile's legal malpractice claims characterized as breach of fiduciary duty and aiding and abetting. Claims that are directly related to the legal malpractice are tolled under the *Hughes* doctrine when a party files a legal malpractice claim. *Pollard v. Hanschen*, 315 S.W.3d 636, 640 (Tex. App.—Dallas 2010, no pet.). We sustain White Nile's issues to the extent we conclude the trial court erred in granting traditional summary judgment based on the arguments of Travis and his firm that limitations were not tolled past 2011 on White Nile's legal malpractice claims. *See Erikson*, 590 S.W.3d at 563; *Hughes*, 821 S.W.2d at 157; *Zive*, 610 S.W.3d at 48. Because of our resolution of these issues, we need not further address White Nile's issues. *See* TEX. R. APP. P. 47.1 (Court of appeals must

–13–

hand down written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.


/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

200354F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

WHITE NILE SOFTWARE, INC.,
Appellant

No. 05-20-00354-CV      V.

JEFFREY M. TRAVIS AND
TRAVIS & CALHOUN, P.C.,
Appellees

On Appeal from the 14th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-17108.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant WHITE NILE SOFTWARE, INC. recover its costs of this appeal from appellee JEFFREY M. TRAVIS AND TRAVIS & CALHOUN, P.C..

Judgment entered this 29th day of August 2022.